# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### Atlanta Division

| | |
|---|---|
| JANICE MOODY, *on behalf of herself and all others similarly situated*, <br><br> Plaintiff, <br><br><br> v. <br><br><br> NEWREZ, LLC d/b/a SHELLPOINT MORTGAGE SERVICING, <br><br> Defendant. | <br><br><br><br><br> Civil Action No. _____ |

## CLASS ACTION COMPLAINT

Plaintiff Janice Moody ("Plaintiff"), individually and on behalf of all others similarly situated, through her undersigned counsel, files this Class Action Complaint against Newrez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") and alleges as follows:

## BACKGROUND

1.    This case concerns the decision by Shellpoint and its predecessor in interest, Specialized Loan Servicing, LLC ("SLS"), to inflate borrowers' balances on long-dormant second mortgages through unfair, deceptive, and unconscionable

means.

2.      In the lead up to the Great Recession, mortgage lenders targeted prospective homebuyers by offering loans that required no downpayment.  These lending arrangements typically involved two loans:  a primary mortgage that covered approximately 80 percent of the home's appraised value; and a second "piggyback" mortgage that operated as a functional downpayment to cover the remaining sales price.  By design, the second mortgage overextended borrowers, resulting in the mass foreclosures that caused the Great Recession.[1]

3.      Plaintiff purchased a home using this 80/20 mortgage arrangement in 1999, both of which she refinanced in 2006.

4.      Plaintiff's second mortgage is serviced by Shellpoint, the successor to the previous servicer SLS following an acquisition and merger earlier this year.[2]

---

[1] The Consumer Financial Protection Bureau describes "80/20" loans as a type of "piggyback mortgage product" that "involved a first lien loan for 80% of the value of the home and a second lien loan for the remaining 20% of the home's valuation." *See* CONSUMER FIN. PROT. BUREAU, *CFPB Issues Guidance to Protect Homeowners from Illegal Collection Tactics on Zombie Mortgages*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-guidance-to-protect-homeowners-from-illegal-collection-tactics-on-zombie-mortgages (last visited Feb. 1, 2024).

[2] *Rithm Capital to Acquire Specialized Loan Servicing LLC*, Businesswire (Oct. 2, 2023), https://www.businesswire.com/news/home/20231001340340/en/Rithm-Capital-to-Acquire-Specialized-Loan-Servicing-LLC.

5.    However, under its standard policies and procedures, Shellpoint's predecessor SLS stopped sending Plaintiff monthly statements on her second mortgage in or around 2010, when the mortgage was discharged and charged off following a Chapter 7 bankruptcy.

6.    At the time of Plaintiff's bankruptcy, the Truth in Lending Act ("TILA") and its enacting regulation, "Regulation Z," did not require servicers to send statements to mortgages discharged through bankruptcy.  But in April 2018, the Consumer Financial Protection Bureau ("CFPB") changed Regulation Z to require that statements be sent even to those whose debt was discharged so long as the debtor still retained an interest in the underlying property that was subject to foreclosure, as Plaintiff did here.   SLS even acknowledged this change in correspondence sent to borrowers of discharged mortgages like Plaintiff's mortgage here.

7.    Despite SLS's knowledge of the new regulations, SLS did not start sending monthly statements to borrowers whose loans had been discharged in bankruptcy.

8.    Statements, of course, would have periodically apprised Plaintiff of the balance of her loan, including interest that was supposedly still accruing after

discharge and charge-off of the loan in 2010.  Statements were especially critical because Plaintiff was at risk of losing her home through foreclosure.

9.      As a result, Plaintiff heard nothing about her mortgage for more than a decade, including during the four-year period after the TILA regulations changed in 2018.

10.      Then, Plaintiff received a letter from Shellpoint's foreclosure attorney in July 2024 stating that her home would be sold through nonjudicial foreclosure in September 2024 if she did not agree to pay the additional amounts.

11.      Plaintiff disputed the amounts Shellpoint claimed she owed in multiple Qualified Written Requests ("QWR").

12.      In response to the QWRs, Shellpoint claimed that the amounts it had assessed on the loan were correct, that (contrary to Regulation Z's plain language) it was not required to send her monthly statements, and that it could foreclose on her home.

13.      To avoid the exact circumstance Plaintiff now faces, TILA and Regulation Z require creditors and the servicers like SLS and Shellpoint who work on their behalf to send monthly statements to borrowers.  *See* 15 U.S.C. § 1638(f) ("The creditor, assignee, or servicer with respect to any residential mortgage loan shall transmit to the obligor, for each billing cycle, a statement . . . ."); 12 C.F.R. §

4

1026.41(a)(2) (requiring periodic statements for closed-credit residential mortgage loans); *see also* 12 C.F.R. § 1026.41(e)(5) (requiring monthly statements be sent to borrowers of closed-end credit loans discharged through bankruptcy except in specific circumstances); 12 C.F.R. § 1026.41(e)(6)(i) (providing that additional late fees or interest cannot be assessed on a charged-off account if statements are not sent); 12 C.F.R. § 1026.41(e)(6)(ii) (providing that interest and fees may be charged on a charged-off account once the sending of monthly statements is resumed, but fees or interest may not be retroactively assessed for the time during which statements were not sent).

14.     In fact, the CFPB has stated that times of default are "precisely when a consumer most needs the periodic statement" to "document fees and charges to the consumer."[3]  Simply put, "as long as such charges may be assessed, the consumer is entitled to receive a periodic statement."[4]

---

[3] 12 C.F.R. Part 1026 (CFPB Official Interpretations), https://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-tila.pdf (last visited Oct. 2, 2024).

[4] *Id.*

15.    The CFPB has also identified the same issue with servicers like Shellpoint and SLS assessing interest and fees on long-dormant mortgages for periods in which they failed to provide monthly statements to consumers:[5]

> Leading up to the 2008 financial crisis, many lenders originated mortgages to consumers without considering their ability to repay the loans. … One common piggyback mortgage product, known as an 80/20 loan, involved a first lien loan for 80 percent of the value of the home and a second lien loan for the remaining 20 percent of the valuation. … [In the event of default,] the second mortgage holder only receives proceeds from the foreclosure sale if there are any funds left after paying off the first mortgage. As a result, many second mortgage holders of piggyback loans, recognizing that a foreclosure would not generate enough money to cover even the first mortgage, charged their defaulted loans off as uncollectible and ceased communicating with the borrowers. … Many borrowers, having not received any notices or periodic statements for years, concluded that their second mortgages had been modified along with the first mortgage, discharged in bankruptcy, or forgiven. In recent years, as home prices have increased and borrowers have paid down their first mortgages, after years of silence, some borrowers are hearing from companies that claim to own or have the right to collect on their long-dormant second mortgages. These companies often demand the outstanding balance on the second mortgage, plus fees and interest, and threaten to foreclose if the borrower does not or cannot pay.

16.    SLS's and Shellpoint's unfair practices also violate contract waiver principles, which prevent creditors and servicers from claiming amounts owed under a contract when they have failed to provide notice to the borrower of the

---

[5] Consumer Financial Protection Bureau, Advisory Opinion re: 12 C.F.R. Part 1006 (2023), https://files.consumerfinance.gov/f/documents/cfpb_regulation-f-time-barreddebtadvisory-opinion_2023-04.pdf.

accumulation of those amounts, especially, in this case, when they had over a decade to provide notice but failed to do so.

17.    In blatant disregard of its obligations under TILA, SLS failed to send monthly statements to Plaintiff and others who had their debt discharged during bankruptcy while retaining an interest in their property, yet it continued to assess interest and fees to their accounts, causing the balances to increase with no notice to consumers about the ballooning balance.

18.    And, when consumers disputed the inaccurate amount of their loan, Shellpoint refused to correct their accounts, as part of its standard policy in responding to those disputes.

19.    This conduct has significantly damaged the Plaintiff and countless other consumers, who have lost significant equity in their homes because of the illegal fees and charges that Shellpoint claims that they owe.

20.    As a result, Plaintiff brings class claims against the Defendant for violations of TILA, 15 U.S.C. § 1638(f), for failing to send monthly statements; and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. 2605(e)(2), for failing to remove the illegal interest and fees in response to consumers' QWRs. She also seeks a declaratory judgment that SLS and Shellpoint are not entitled to collect the illegal interest and fees.

21.     Plaintiff also alleges individual claims against Shellpoint for violations of the Real Estate Settlement Procedures Act ("RESPA") and under Georgia law for the improper attempt to foreclose on her home.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

23.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District and Division, where Plaintiff resides.

## PARTIES

24.     Plaintiff Janice Moody is a natural person residing in Stone Mountain, Georgia.

25.     Defendant Newrez, LLC d/b/a Shellpoint is a limited liability company organized under the laws of Delaware.  Shellpoint is the successor-in-interest to SLS by virtue of the acquisition of SLS by Shellpoint's parent company, Rithm Capital, and the merger of SLS with Shellpoint, effective May 1, 2024.

26.     Shellpoint is a mortgage loan servicing company governed by RESPA.

## FACTS

### *Zombie Second Mortgages*

27.     This case arises from the recent wave of attempts to collect "zombie" second mortgages—largely, subprime second mortgages originated before the 2007–08 mortgage crisis.

28.     Before the mortgage crisis, second mortgages were often used in "80/20" mortgage schemes, which allowed underqualified borrowers to finance home purchases through two mortgages—without a down payment and without having to pay for mortgage insurance.

29.     But second mortgages severely harmed consumers because of high interest rates and large balloon payments due at the end of the loan.

30.     Many consumers during the Great Recession filed for bankruptcy, which eliminated their personal liability for paying their second mortgage. The lien on their home remained, however, meaning that if they did not continue paying their mortgage, the lender could foreclose on their home.

31.     In the years following the Great Recession, lenders were not required to send monthly statements to consumers who had received a bankruptcy discharge on their second mortgage.

32.    Without the monthly statements, many post-bankruptcy consumers did not understand that they had to continue paying their second mortgage to avoid foreclosure.

33.    Because the liens were still underwater following the bankruptcy, investors and servicers did not attempt to collect the outstanding loan balances through foreclosure. Instead, the loans stayed dormant and were sold—often several times—to various debt buyers and subprime lenders.

34.    Then, in April 2018, the CFPB changed Regulation Z to require loan servicers to send monthly mortgage statements to consumers who had discharged their mortgage in bankruptcy so long as they still retained an interest in the underlying property.

35.    Under the updated Regulation Z, a servicer can stop sending monthly statements if the consumer's mortgage loan is discharged through bankruptcy *and* at least one of the following occurs:

(1) The consumer requests in writing that the servicer cease providing a periodic statement or coupon book;

(2) The consumer's bankruptcy plan provides that the consumer will surrender the dwelling securing the mortgage loan, provides for the avoidance of the lien securing the mortgage loan, or otherwise does not provide for, as applicable, the payment of pre-bankruptcy arrearage or the maintenance of payments due under the mortgage loan;

(3) A court enters an order in the bankruptcy case providing for the avoidance of the lien securing the mortgage loan, lifting the automatic stay pursuant to 11 U.S.C. 362 with regard to the dwelling securing the mortgage loan, or requiring the servicer to cease providing a periodic statement or coupon book; or

(4) The consumer files with the court overseeing the bankruptcy case a statement of intention pursuant to 11 U.S.C. 521(a) identifying an intent to surrender the dwelling securing the mortgage loan and a consumer has not made any partial or periodic payment on the mortgage loan after the commencement of the consumer's bankruptcy case.

12 C.F.R. § 1026.41(e)(5)(i). If none of these exemptions apply, then the servicer must send monthly statements to post-bankruptcy consumers.

36.    Despite this updated regulation, many loan servicers, including SLS, did not start sending monthly mortgage statements to post-bankruptcy consumers—even though these statements would have alerted consumers to the fact that these mortgages still existed and were continuing to accumulate interest and other fees.

37.    This information, of course, would have allowed consumers to address their outstanding debt and prevent the loan balances from continuing to grow.

38.    In fact, SLS acknowledged in correspondence sent to borrowers in the same situation as Plaintiff that, as of April 2018, it was required to send statements even for debts discharged through bankruptcy.

39.    Yet, SLS failed to update its internal policies and procedures after the regulations were changed to ensure that these statements were actually sent to borrowers, including Plaintiff.

40.    And even though it was not sending the legally required monthly mortgage statements, SLS continued to assess interest charges and fees to the loans each month, causing the balances to balloon without giving consumers notice of the rapidly increasing balance.

41.    In Plaintiff's case, for example, SLS and now Shellpoint have assessed $20,000 in improper fees and charges to Plaintiff's loan, which they are now seeking to collect through the foreclosure of her home.

42.    When companies like SLS and Shellpoint attempt to collect and actually collect these improper charges, including through foreclosure, they not only rob consumers of their homes, but they also strip them of tens of thousands of dollars in equity—one of the primary ways that low- and middle-income families build wealth.

### *Plaintiff's Zombie Second Mortgage*

43.    In 1999, Plaintiff purchased her home in Stone Mountain, Georgia.

44.    As with many borrowers at the time, Plaintiff used an 80/20 mortgage structure to finance her home purchase, with a primary mortgage to cover

approximately 80 percent of the home's appraised value, and a second mortgage to cover the remaining 20 percent of the home's value.

45.    Plaintiff's second mortgage had an initial principal balance of $30,000.

46.    In 2006, Plaintiff refinanced her 80/20 mortgages to obtain a lower interest rate and avoid balloon payments.

47.    SLS was the servicer of Plaintiff's second mortgage from at least 2006 until July 2, 2024, when Shellpoint assumed servicing obligations for the loan following its merger with SLS.

48.    After Plaintiff fell on hard times during the height of the Great Recession, in 2010, Plaintiff filed for Chapter 7 bankruptcy.

49.    During the bankruptcy, Plaintiff filed a Statement of Intention indicating that she would retain her interest in her home and continue to pay the first and second mortgages pursuant to agreed-upon terms.

50.    As a result of the bankruptcy, in August 2010, Plaintiff's second mortgage was discharged and charged off.  At the time of charge off, her second mortgage had an outstanding principal balance of approximately $29,000.

51.    Following this discharge and charge off, Plaintiff stopped receiving monthly statements and other correspondence regarding her second mortgage.

52.    For over a decade, Plaintiff heard nothing from SLS regarding her second mortgage.  She received no monthly statements or other correspondence that claimed she owed any amounts on the loan, including after April 2018.

53.    In the meantime, she continued to make payments on her primary mortgage, assuming based on the lack of any correspondence that her second mortgage had been rolled into the primary mortgage or otherwise forgiven as part of the modification of the mortgage through bankruptcy.

54.    Since her bankruptcy filing, Plaintiff has not received a single monthly statement claiming that she owed any amounts on her loan.

55.    In July 2024, Plaintiff received a Notice of Nonjudicial Foreclosure Sale from Shellpoint's foreclosure attorney, which stated that her second mortgage had been referred to foreclosure and would be sold at auction in September 2024 if she did not pay the inflated amounts, including approximately $23,000 in inflated interest it claimed were owed.

56.    At the time she received this Notice from Shellpoint, Plaintiff still had not received a single monthly statement from Shellpoint or SLS since 2010.  Nor had she received a Notice of Default that correctly stated the amounts required to cure the default on her loan.

57.    In response to the foreclosure notice, Plaintiff sent a Qualified Written Request to SLS—which by this point had merged with Shellpoint.

58.    Plaintiff's Qualified Written Request was sent to the address that SLS/Shellpoint had designated for these types of correspondence, and SLS/Shellpoint received it.

59.    Plaintiff's Qualified Written Request, which contained information sufficient to identify her loan, noted that she had filed for bankruptcy and had not received any monthly statements since her second mortgage was discharged and charged off.  She asked Shellpoint/SLS to explain why it claimed she owed the amounts it stated in its foreclosure notice when she had not received any correspondence or statements on the account for such a long period.

60.    Plaintiff's first QWR also asked Shellpoint to investigate and explain how it calculated the interest on her loan, and it asked Shellpoint to provide her with a copy of her servicing notes and the loan account history.

61.    In August 2024, Plaintiff also sent a letter to the foreclosure attorney noting that she disputed the mortgage debt and had challenged the debt in a QWR to SLS/Shellpoint.

62.    In response to Plaintiff's QWR, in August 2024, Shellpoint provided a boilerplate response claiming that it was not obligated to respond to Plaintiff's

15

inquiries and that she had failed to provide sufficient details regarding errors in the servicing of her loan for it to perform an investigation.

63.    Paradoxically, while claiming it lacked sufficient information to conduct an investigation, Shellpoint attached documents related to Plaintiff's loan that detailed numerous issues with her loan servicing and supported the very basis for her requested investigation in her initial QWR.

64.    For example, the loan history provided by Shellpoint only dated back to 2009, when the loan originated in 1999 and was refinanced in 2006.  There was also a nine-year gap from July 2010 through July 2019 with no recorded account history, including evidence that Shellpoint's predecessor SLS had sent monthly statements.

65.    Moreover, the loan history provided by Shellpoint showed that Shellpoint/SLS had not assessed interest on the loan from May 2010 through August 2024, even though it provided billing statements starting in August 2024 stating that she owed over $23,000 in interest and fees for the same period.

66.    Shellpoint/SLS also refused to send Plaintiff her servicing notes.

67.    Noting these discrepancies, in September 2024, Plaintiff sent a follow-up QWR to the designated QWR addresses for both Shellpoint and SLS.

68.    The follow-up QWR, which contained information sufficient to identify her loan, explained the discrepancies in the records provided in response to Plaintiff's initial QWR and again requested that Shellpoint/SLS investigate and explain how it had calculated the assessment of interest and fees when its own records showed no statements had been sent as required by federal regulations.

69.    Plaintiff's follow-up QWR also asked Shellpoint/SLS to provide her servicing notes, the account history, and a copy of all invoices for any charges assessed to the loan.

70.    This QWR was also sent to the designated address for these types of correspondence, and Shellpoint/SLS received it.

71.    In response, Shellpoint sent a letter to Plaintiff stating that it was "working to gather the requested information and will forward it to [her] as soon as possible."

72.    Then, on October 25, 2024, Plaintiff received a response from Shellpoint stating that "billing statements were discontinued due to [Plaintiff's] Chapter 7 bankruptcy filing on May 11, 2010," conceding that it had not sent statements to Plaintiff since that date.  Yet, it claimed it could still foreclose on her property to collect interest and fees that had been assessed during this period, which

it now claimed totaled $22,681.03 ($21,478,10 in interest and $1,203.53 in "other fees"), as well as $2,013.00 in "legal fees."

73.    Despite the obvious discrepancy between the admission that it had not sent statements to Plaintiff required by federal law and the amounts it was attempting to collect on the loan, Shellpoint insisted that the foreclosure on Plaintiff's property would proceed "unless the loan is reinstated, a complete loss mitigation application is submitted, or an approved workout plan is in place," all of which contemplate Plaintiff paying for the thousands in additional interest and fees about which SLS and Shellpoint never informed her for years.

74.    SLS's and now Shellpoint's conduct has caused considerable damages to Plaintiff, including the lost equity of close to $25,000 for which Shellpoint retroactively assessed as interest, as well as the significant emotional distress of facing the loss of her family home if she did not pay amounts that she had no idea were purportedly accumulating during over a decade of hearing nothing regarding the alleged debt.

## COUNT ONE:
### Violation of RESPA, 12 U.S.C. § 2605(e)(2); Reg. X, 12 C.F.R. § 1024.35(e)
### (Class Claim)

75.    Plaintiff incorporates the preceding allegations. re-alleges and incorporates by reference the allegations set forth above.

76.    Under Federal Rule of Civil Procedure 23, Plaintiff brings this count on behalf of herself and the following class of which she is a member:

> All consumers: (1) with a federally-related closed-end mortgage serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (2) with a discharged mortgage loan; (3) who did not otherwise qualify as exempt from receiving statements under 12 C.F.R. § 1026.41(e)(5)(i); for whom SLS's records reflect were not receiving monthly mortgage statements after April 19, 2018; (4) and who, from November 22, 2021 to the present, sent SLS a Qualified Written Request that disputed SLS's assessment of interest or other fees on their mortgage; (4) in response to which, SLS refused to remove the interest or fees from the consumer's account

77.    **Numerosity**. **Fed. R. Civ. P 23(a)(1).** The class members are so numerous that joinder of all is impractical. Upon information and belief, SLS serviced thousands of non-performing loans and subjected all of them to the same procedures for the SLS's response to their Qualified Written Request.  The class members' names and addresses are identifiable through Shellpoint's internal business records, and they may be notified of this litigation by published or mailed notice.

78.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**  Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only

individual class members.  The principal issues include: (1) whether RESPA applies to the Plaintiff's and putative class members' loans; (2) whether Shellpoint violated § 2605(e)(2) of RESPA by failing to make the appropriate corrections in response to the Plaintiff's and putative class members' Qualified Written Request; and (3) the appropriate amount of statutory damages.

79.  **Typicality. Fed. R. Civ. P. 23(a)(3).**  Plaintiff's claims are typical of the claims of each putative class member.  Plaintiff is also entitled to relief under the same causes of action as the other putative class members.  All claims are based on the same facts and legal theories.

80.  **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).**  Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the class members that she seeks to represent. Plaintiff have retained counsel competent and experienced in class-action litigation, including against SLS, and she intends to continue to prosecute the action vigorously.  Plaintiff and her counsel will fairly and adequately protect the putative class members' interests.  Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

81.  **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual

members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each member are such that individual prosecution would prove burdensome and expensive.  It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation.  Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by SLS's and Shellpoint's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

82.    Shellpoint violated 12 U.S.C. § 2605(e)(2) by failing to make appropriate corrections to Plaintiff's and the putative class members' account in response to their Qualified Written Requests, including removal of the improper interest and fees from their account assessed during the time that they were not receiving monthly statements.

83.    These charges were not permissible because the consumers were not receiving monthly mortgage statements, even though SLS was required to send them

after the April 2018 amendments to Regulation Z. SLS, therefore, should have removed the charges in response to the Plaintiff's and putative class members' QWRs.

84.    Shellpoint/SLS also did not conduct a reasonable investigation in response to the Plaintiff's and putative class members' QWRs.

85.    Had a reasonable investigation occurred, Shellpoint/SLS would have discovered that no interest could lawfully accrue on the loans because SLS and Shellpoint had not sent periodic statements to Plaintiff and putative class members since the April 2018 Regulation Z updates.

86.    Because of Shellpoint's conduct, Plaintiff and the putative class members suffered concrete injury in fact, lost equity, informational injury, and emotional distress, including aggravation and distress.

87.    In addition, some class members suffered actual damages when they paid improper interest and fees to Shellpoint and/or SLS.

88.    Upon information and belief, discovery will reveal that Shellpoint's noncompliance with 12 U.S.C. § 2605(e)(2) is part of a pattern or practice of noncompliance with this provision.

89.    Shellpoint and its predecessor SLS have been sued multiple times for failing to properly respond to QWRs, including by failing to conduct a proper investigation or provide requested information.

90.    In addition, the CFPB's consumer complaint portal shows that 8,017 mortgage-related complaints have been filed against SLS as of October 22, 2024, including 144 complaints for failing to investigate an existing problem.

91.    As of the same date, Shellpoint had 10,353 mortgage-related complaints filed with the CFPB, including 294 complaints for failing to investigate an existing problem.

92.    Under 12 U.S.C. § 2605(f), Plaintiff seeks statutory damages for herself and each putative class member, as well as her reasonable attorneys' fees and costs. Plaintiff also seeks actual damages for class members in the amount of the improper amounts paid to Shellpoint and/or SLS.

**COUNT TWO:**
**Violation of TILA, 15 U.S.C. § 1638(f), 12 C.F.R. § 1026.41(a)(2)**
**(Class Claim)**

93.    Plaintiff incorporates the preceding allegations.

94.    Under Federal Rule of Civil Procedure 23, Plaintiff brings this count on behalf of herself and the following class of which she is a member:

All consumers: (1) with a closed-end mortgage serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (2) who retained an interest in the property against which the loan was secured following a discharge of the debt during bankruptcy and who did not otherwise qualify as exempt from receiving statements under 12 C.F.R. § 1026.41(e)(5)(i); (3) and for whom Shellpoint's records show they did not send a written request to cease providing statements; (4) to whom Shellpoint's records show the consumer was not sent a periodic statement until within the past year.

95.   **Numerosity. Fed. R. Civ. P 23(a)(1).** The class members are so numerous that joinder of all is impractical. Upon information and belief, SLS serviced thousands of loans and subjected all of them to the same procedures for the retroactive assessment of interest, which practices Shellpoint continued after acquiring servicing rights to the loans.  The class members' names and addresses are identifiable through Shellpoint's internal business records, and they may be notified of this litigation by published or mailed notice.

96.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**  Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.  The principal issues include: (1) whether Shellpoint is a "servicer" under TILA and Regulation Z; (2) whether Shellpoint and its predecessor SLS violated 15 U.S.C. § 1638 and 12 C.F.R. § 1026.41 by failing to send periodic

statements to Plaintiff and the putative class members; and (3) the appropriate amount of statutory damages.

97.     **Typicality. Fed. R. Civ. P. 23(a)(3).**  Plaintiff's claims are typical of the claims of each putative class member.  Plaintiff is also entitled to relief under the same causes of action as the other putative class members.  All claims are based on the same facts and legal theories.

98.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**.  Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the class members that she seeks to represent. Plaintiff have retained counsel competent and experienced in class-action litigation, including against SLS, and she intends to continue to prosecute the action vigorously.  Plaintiff and her counsel will fairly and adequately protect the putative class members' interests.  Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

99.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each member are such that individual prosecution would prove burdensome and expensive.  It would

be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by SLS's and Shellpoint's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

100.   Shellpoint violated § 1638 of TILA and § 1026.41 of Regulation Z by failing to send to Plaintiff and the putative class members periodic statements for each billing cycle.

101.   Shellpoint and its predecessor SLS were obligated to send Plaintiff and the putative class members periodic statements under 15 U.S.C. § 1638 and 12 C.F.R. § 1026.41.

102.   Despite this requirement, SLS's policies and procedures prevented the sending of statements to Plaintiff and the putative class members whose debts had been discharged through bankruptcy.

103.  Plaintiff and the putative class members suffered a concrete injury in fact because of Shellpoint's and SLS's failure to send statements, including, for example, the assessment of retroactive interest and fees that they had no ability to prevent from accumulating, emotional distress from the threatened foreclosure and loss of their homes and the attempted collection of vastly inflated debts, and the lost equity in their homes.

104.  In addition, some class members suffered actual damages when they paid improper interest and fees to Shellpoint and/or SLS for periods in which they did not receive statements.

105.  Under 15 U.S.C. § 1640, Plaintiff seeks actual and statutory damages for herself and each putative class member, as well as her reasonable attorneys' fees and costs.  Plaintiff also seeks actual damages for class members in the amount of the improper amounts paid to Shellpoint and/or SLS.

**COUNT THREE:**
**Declaratory Judgment Under 28 U.S.C. § 2201**
**(Class Claim)**

106.  Plaintiff incorporates the preceding allegations.

107.  Under Federal Rule of Civil Procedure 23, Plaintiff brings this action for herself and on behalf of the following class:

All consumers: (1) with a closed-end mortgage serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (2) who retained an interest in the property against which the loan was secured following a discharge of the debt during bankruptcy and who did not otherwise qualify as exempt from receiving statements under 12 C.F.R. § 1026.41(e)(5)(i); (3) and for whom Shellpoint's records show they did not send a written request to cease providing statements; (4) to whom SLS did not sent monthly mortgage statements starting after April 19, 2018; and (5) against whom SLS, Shellpoint, or its agents have collected or attempted to collect late fees, default-related fees or interest assessed by SLS for time periods when the consumer did not receive monthly statements.

108.    **Numerosity**. **Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. Upon information and belief, SLS/Shellpoint services thousands of discharged mortgages and subjects all of them to the same procedures for the assessment of interest and transmittal of monthly billing statements. The class members' names and addresses are identifiable through SLS/Shellpoint's internal business records, and they may be notified of this litigation by published or mailed notice.

109.    **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual

class members. The principal issues include: (1) whether Plaintiff and the putative class members are subject to ongoing harm absent a declaratory judgment; and (2) whether Plaintiff and the putative class members are entitled to a declaratory judgment that they do not owe interest and fees for the months that they were not sent monthly statements after April 19, 2018; and (3) the appropriate scope of the declaratory judgment.

110. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. She is also entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

111. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the class members that she seeks to represent. Plaintiff has retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

112. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by SLS/Shellpoint's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

113. Because the Plaintiff and putative class members were the subject of collection effort that included interest and fees that the Plaintiff and putative class members did not owe, SLS/Shellpoint is attempting to collect more money than is due under the Plaintiff's and putative class members' loans.

114.    Plaintiff and members of the class are subject to ongoing harm absent a declaration that interest and fees are waived and/or unenforceable, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

115.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the disputed interest and fees,

116.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the ongoing attempted imposition of the interest and fees.

117.    Accordingly, Plaintiff seeks a declaratory judgment that all interest and fees assessed for periods from April 19, 2018 to the present in which SLS/Shellpoint or its predecessors-in-interest failed to provide periodic statements are waived and/or unenforceable.

### COUNT FOUR:
### Violation of RESPA, 12 U.S.C. § 2605(e)(2)
### (Individual Claim)

118.    Plaintiff incorporates the preceding allegations.

119.   As alleged above, Plaintiff submitted two QWRs to Shellpoint and its predecessor in interest SLS, and Shellpoint and SLS received these requests.

120.   The mortgage obligation at issue is a "federally related mortgage loan" under RESPA, 12 U.S.C. § 2602(1), in that it is secured by a subordinate lien on residential real property designed for the occupancy of one to four families and the proceeds of it were used to purchase the secured property, and it was made by a lender whose deposits and accounts are insured by the FDIC and who is regulated by the Office of the Comptroller of the Currency.

121.   Plaintiff was a borrower of the subject mortgage and Shellpoint and its predecessor in interest SLS were the servicers of the mortgage in accordance with 12 U.S.C. § 2605(e).

122.   Plaintiff's letters from July and September 2024 each constituted a Request for information under 12 C.F.R. § 1024.35 in that Plaintiff asked Shellpoint/SLS to provide her with information about the servicing of her loan.

123.   Plaintiff's letters were sent to the address designated by SLS and Shellpoint for requests for information.

124.   Shellpoint violated 12 U.S.C. § 2605(e)(2) by failing to provide Plaintiff with most of the information she requested or to explain why the requested information was unavailable.

125. For example, SLS did not provide Plaintiff with her servicing notes, a full account history, or the invoices for each of the charges that it had assessed to her loan.

126. Because of Shellpoint's conduct, Plaintiff suffered concrete and particularized harm, including: informational injury and emotional distress, including aggravation and distress from the threatened loss of her family home to foreclosure and the lost equity in her home because Shellpoint refused to remove the inflated interest charges.

127. Upon information and belief, discovery will reveal that Shellpoint's noncompliance with 12 U.S.C. § 2605(e)(2) is part of a pattern or practice of noncompliance with this provision.

128. Shellpoint and its predecessor SLS have been sued multiple times for failing to properly respond to QWRs, including for failing to provide requested information.

129. In addition, the CFPB's consumer complaint portal shows that 8,017 mortgage-related complaints have been filed against SLS as of October 22, 2024, including 144 complaints for failing to investigate an existing problem.

130.    As of the same date, Shellpoint had 10,353 mortgage-related complaints filed with the CFPB, including 294 complaints for failing to investigate an existing problem.

131.    Plaintiff is thus entitled to recover her actual damages, statutory damages, costs, and attorneys' fees from Shellpoint for each of its violations of 12 U.S.C. § 2605(e)(2) under 12 U.S.C. § 2605(f).

**COUNT FIVE:**
**Wrongful Attempted Foreclosure**
**(Individual Claim for Injunctive Relief)**

132.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

133.    Pursuant to O.C.G.A. § 23-1-1, courts applying Georgia law are vested with the jurisdiction to issue equitable remedies, including preventing anticipated wrongs under § 23-1-3.

134.    Georgia law imposes an equitable duty on entities exercising the power of sale in "deeds of trust, mortgages, and other instruments" to do so "fairly." O.S.G.C. § 23-2-114.

135.    Here, Shellpoint has threatened to exercise the power of sale under Plaintiff's second mortgage deed of trust in an unfair manner, including by:

a. After a decade of silence by it and its predecessor-in-interest, SLS, sending correspondence to Plaintiff seeking to collect tens of thousands in additional interest and fees despite acknowledging that it had not sent monthly statements required by federal law;

b. Refusing to properly investigate her disputes, including remedying the overstated interest and amounts despite its acknowledgment that it had stopped sending monthly statement to her in 2010;

c. Insisting that the foreclosure would continue even while acknowledging that it had violated federal law by failing to send monthly statements; and

d. Failing to provide a notice of default that properly apprised Plaintiff of the actual amount required to cure the alleged default.

136. This conduct by Shellpoint, along with its continued demands of exorbitant improper and unauthorized amounts, constitutes a violation of its duty to exercise the power of sale fairly and in good faith.

137. The scheduled foreclosure sale poses a risk of imminent, irreparable harm to Plaintiff, as it would result in the loss of her home.

138. Plaintiff thus seeks an order enjoining Shellpoint from proceeding with the scheduled foreclosure sale of her home.

WHEREFORE, Plaintiff respectfully requests her actual and statutory damages; declaratory and injunctive relief; attorneys' fees and costs; pre- and post-judgment interest at the legal rate; and any other relief that the Court finds appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,
**PLAINTIFF**

By:    */s/ Matthew G. Rosendahl*
Matthew G. Rosendahl (Ga. Bar # 449311)
KELLY GUZZO, PLC
3925 Chain Bridge, Suite 202
Fairfax, VA  22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: matt@kellyguzzo.com

*Counsel for Plaintiff*

## **CERTIFICATE OF COUNSEL**

I hereby certify that the foregoing document has been prepared with Times New Roman 14-point font, one of the font and point selections approved by the Court in LR 5.1, N.D. Ga.

*/s/ Matthew G. Rosendahl*