IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JANICE MOODY, *on behalf of herself and all others similarly situated*,<br>　　Plaintiff,<br><br>v.<br><br>NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING,<br>　　Defendant. | CIVIL ACTION NO.<br>1:24-cv-5406-ELR-CMS |

## <u>NON-FINAL REPORT AND RECOMMENDATION</u>

Plaintiff Janice Moody, on behalf of herself and all others similarly situated, brings this putative class action alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, the Truth in Lending Act ("TILA"), 15 U.S.C. § 1638(f), the Declaratory Judgment Act, 28 U.S.C. § 2201, and Georgia common law.  This matter presently is before the Court on the Motion to Strike Class Allegations and for Judgment on the Pleadings filed by Defendant NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Defendant" or "Shellpoint").  [Doc. 25].  For the reasons set forth below, I will recommend that the motion for judgment on the pleadings be **GRANTED in part** and **DENIED in part**, resulting in the dismissal of all class action claims and Plaintiff's individual claim for attempted wrongful foreclosure, and that the motion to strike class allegations be **DENIED as moot**.

## I.    BACKGROUND

### A.    Procedural History

On November 22, 2024, Plaintiff filed this case.  [Doc. 1].  On December 19, 2024, Plaintiff filed a First Amended Class Action Complaint (the "Amended Complaint").  [Doc. 6, Am. Compl.].  On January 27, 2025, Shellpoint answered the Amended Complaint.  [Doc. 7].

On May 1, 2025, while the parties were engaged in fact discovery, Defendant filed its Motion to Strike Class Allegations and for Judgment on the Pleadings.  [Doc. 25].  Plaintiff filed a response in opposition to the motion, and Defendant filed a reply in support of the motion.  [Docs. 42, 45].

At the parties' request, the Court temporarily stayed the case through September 30, 2025, to allow the parties to engage in a private mediation.  [Docs. 46, 47].  After the parties were unable to reach a settlement and discovery resumed, Defendant filed a Notice of Supplemental Authority, attaching an opinion from the United States District Court for the Northern District of Illinois.  [Doc. 51].  Plaintiff filed a response, and Defendant filed a notice stating that Plaintiff's response to the Notice of Supplemental Authority is not proper.  [Docs. 52, 53].

The Motion to Strike Class Allegations and for Judgment on the Pleadings is ripe for resolution.  I exercise my discretion to consider all filings pertaining to the motion, including the Notice of Supplemental Authority and the response thereto.

**B.    The Amended Complaint**

*1.  Facts*

In 1999, Plaintiff purchased a home in Stone Mountain, Georgia, with a loan arrangement that included a primary mortgage that covered approximately eighty percent of the home's appraised value and a second "piggyback" mortgage that operated as a functional downpayment to cover the remaining sales price.  [Am. Compl. ¶¶ 2, 3, 43, 44].  According to Plaintiff's allegations, these 80/20 mortgage arrangements allowed underqualified borrowers to finance home purchases through two mortgages—without a downpayment and without having to pay for mortgage insurance.  [*Id.* ¶ 28].  Plaintiff's second mortgage had an initial principal balance of $30,000.00.  [*Id.* ¶ 45].  In 2006, Plaintiff refinanced both of her loans to obtain a lower interest rate and avoid balloon payments.  [*Id.* ¶¶ 3, 46].  Specialized Loan Servicing, LLC ("SLS") was the servicer of Plaintiff's second mortgage from at least 2006 until July 2, 2024, when Shellpoint assumed servicing obligations for the loan following an acquisition and merger with SLS.  [*Id.* ¶¶ 4, 47].

Plaintiff alleges that under SLS's standard policies and procedures, SLS stopped sending Plaintiff monthly statements on her second mortgage in or around 2010, when the mortgage was discharged and charged off following a Chapter 7 bankruptcy that Plaintiff filed during the height of the Great Recession. [Am. Compl. ¶¶ 5, 48, 50, 51]. During the bankruptcy proceeding, Plaintiff filed a Statement of Intention indicating that she intended to remain in her home and pay her mortgages according to the agreed-upon terms. [*Id.* ¶ 49]. At the time of charge-off, Plaintiff's second mortgage had an outstanding principal balance of approximately $29,000.00. [*Id.* ¶ 50].

Plaintiff alleges that she was one of many consumers to file for bankruptcy, which eliminated personal liability for paying the second mortgage. [Am. Compl. ¶ 30]. Plaintiff alleges that the lien on the home remained, however, meaning that if a consumer did not continue paying their mortgage, the lender could foreclose on their home. [*Id.*].

At the time of Plaintiff's bankruptcy, TILA and its enacting regulation, "Regulation Z," did not require servicers to send statements to consumers who had received a bankruptcy discharge on their second mortgage. [Am. Compl. ¶¶ 6, 31]. Plaintiff alleges that without receiving the monthly statements, many post-bankruptcy consumers did not understand that they had to continue paying their

4

second mortgage to avoid foreclosure.   [*Id.* ¶ 32].   Plaintiff alleges that SLS acknowledged in correspondence sent to borrowers of discharged mortgages that the Consumer Financial Protection Bureau ("CFPB") changed Regulation Z in April 2018 to require that statements be sent even to those whose debt was discharged so long as the debtor still retained an interest in the underlying property that was subject to foreclosure.   [*Id.* ¶¶ 6, 34, 38].   SLS allegedly did not start sending monthly statements to these borrowers, despite its knowledge of the new regulations and even though these statements would have alerted the borrowers that these mortgages still existed and were continuing to accumulate interest and other fees.  [*Id.* ¶¶ 7, 36, 39].

Plaintiff alleges that monthly statements would have periodically apprised her of the loan balance, including interest that was still accruing after discharge and charge-off of the loan in 2010.  [Am. Compl. ¶ 8].  Plaintiff alleges that she heard nothing about her second mortgage for more than a decade, including during the four-year period after the TILA regulations changed in 2018.  [*Id.* ¶¶ 9, 52]. Plaintiff alleges that in the meantime, she continued to make payments on her primary mortgage and assumed based on the lack of any correspondence that her second mortgage had been rolled into the primary mortgage or otherwise had been forgiven as part of the modification of the mortgage through bankruptcy.  [*Id.* ¶ 53].

In July 2024, Plaintiff received a letter from Shellpoint's foreclosure attorney stating that her home would be sold through nonjudicial foreclosure in September 2024 if Plaintiff did not agree to pay allegedly inflated amounts, including approximately $23,000.00 in interest that Shellpoint claimed Plaintiff owed. [Am. Compl. ¶¶ 10, 55]. Plaintiff alleges that at the time she received this notice from Shellpoint, she still had not received a single monthly statement from Shellpoint or SLS since 2010, and she had not received a notice of default that correctly stated the amounts required to cure the default on her loan. [*Id.* ¶ 56].

Plaintiff alleges that in response to the foreclosure notice, she disputed the amounts Shellpoint claimed she owed in multiple Qualified Written Requests ("QWRs"). [Am. Compl. ¶¶ 11, 57, 61, 67]. Plaintiff alleges that the first QWR contained information sufficient to identify her loan, noted that she had filed for bankruptcy, and stated that she had not received any monthly statements since her second mortgage was discharged and charged off. [*Id.* ¶ 59]. Plaintiff allegedly asked Shellpoint/SLS to explain why it claimed she owed the amounts it stated in the foreclosure notice when she had not received any correspondence or statements on the account for such a long period. [*Id.*]. She alleges that the QWR also asked Shellpoint to investigate and explain how it calculated the interest on her loan and requested that Shellpoint provide her with a copy of her servicing notes and the loan

account history. [*Id.* ¶ 60]. In addition to sending Shellpoint the QWR, Plaintiff alleges that in August 2024, she sent a letter to the foreclosure attorney, noting that she disputed the mortgage debt and had challenged the debt in a QWR to Shellpoint/SLS. [*Id.* ¶ 61].

In response to the QWR, Shellpoint allegedly provided a boilerplate response that claimed it was not obligated to respond to Plaintiff's inquiries and that Plaintiff had failed to provide sufficient details regarding purported errors in the servicing of her loan for it to perform an investigation. [Am. Compl. ¶ 62]. Plaintiff alleges that Shellpoint nevertheless attached documents related to Plaintiff's loan that revealed numerous issues with her loan servicing and supported the basis for her requested investigation in her initial QWR. [*Id.* ¶ 63]. According to the allegations in the Amended Complaint, the loan history dated back only to 2009, whereas the loan originated in 1999 and was refinanced in 2006. [*Id.* ¶ 64]. Likewise, Plaintiff alleges that there was a nine-year gap from July 2010 through July 2019 with no recorded account history. [*Id.*]. The loan history that Shellpoint provided allegedly showed that Shellpoint/SLS had not assessed interest on the loan from May 2010 through August 2024; yet, Shellpoint provided billing statements starting in August 2024 that indicated Plaintiff owed more than $23,000.00 in interest and fees for the same

period.  [*Id.* ¶ 65].  Plaintiff alleges that Shellpoint refused to send Plaintiff her servicing notes.  [*Id.* ¶ 66].

Plaintiff alleges that in September 2024, she sent a follow-up QWR to the designated QWR addresses for both Shellpoint and SLS.  [Am. Compl. ¶¶ 67, 70]. In the follow-up QWR, Plaintiff allegedly explained the discrepancies in the records provided in response to the initial QWR and again requested that Shellpoint/SLS investigate and explain how it had calculated the assessment of interest and fees when its own records showed that no statements had been sent.  [*Id.* ¶ 68].  Plaintiff also asked Shellpoint/SLS to provide her servicing notes, the account history, and a copy of all invoices for any charges assessed to the loan.  [*Id.* ¶ 69].

In response to the second QWR, Shellpoint sent Plaintiff a letter stating that it was gathering the requested information and would forward it to Plaintiff as soon as possible.  [Am. Compl. ¶ 71].  Then, on October 25, 2024, Plaintiff allegedly received a response from Shellpoint claiming that the amounts it had assessed on the loan were correct, that it was not required to send Plaintiff monthly statements, and that it could foreclose on her home.  [*Id.* ¶¶ 12, 72].  Specifically, Plaintiff alleges that the correspondence stated that "billing statements were discontinued due to [Plaintiff's] Chapter 7 bankruptcy filing on May 11, 2010."  [*Id.* ¶ 72].  Shellpoint allegedly claimed it could still foreclose on her property to collect interest and fees

that had been assessed during this period, which Shellpoint now claimed totaled $22,681.03 ($21,478.10 in interest and $1,203.53 in "other fees"), as well as $2,013.00 in "legal fees." [*Id.* ¶¶ 41, 72]. Shellpoint insisted that it would proceed with the foreclosure on Plaintiff's property "unless the loan is reinstated, a complete loss mitigation application is submitted, or an approved workout plan is in place." [*Id.* ¶ 73]. According to Plaintiff, this would have required Plaintiff to pay "for the thousands in additional interest and fees about which SLS and Shellpoint never informed her for years." [*Id.*].

Plaintiff alleges that SLS and Shellpoint violated TILA and Regulation Z by failing to send her monthly statements. [Am. Compl. ¶ 13]. Plaintiff further alleges that SLS's and Shellpoint's practices violate contract waiver principles, which prevent creditors and servicers from claiming amounts owed under a contract when they have failed to provide notice to the borrower of the accumulation of those amounts. [*Id.* ¶ 16].

While SLS failed to send monthly statements to Plaintiff and others who had their debt discharged during bankruptcy while retaining an interest in their property, SLS allegedly continued to assess interest and fees to the consumers' accounts, causing the balances to increase with no notice to the consumers regarding their ballooning balances. [Am. Compl. ¶¶ 17, 40]. Moreover, as part of its alleged

standard policy in responding to disputes, Shellpoint allegedly refused to correct consumers' accounts after they disputed what they believed were inaccurate amounts of their loans.  [*Id.* ¶ 18].  Plaintiff alleges that this conduct has significantly damaged her and other consumers, who have lost significant equity in their homes because of the fees and charges that Shellpoint claims they owe.  [*Id.* ¶¶ 19, 42]. Plaintiff alleges that "SLS's and now Shellpoint's conduct has caused considerable damages to [her], including the lost equity of close to $25,000 for which Shellpoint retroactively assessed as interest, as well as the significant emotional distress of facing the loss of her family home if she did not pay amounts that she had no idea were purportedly accumulating during over a decade of hearing nothing regarding the alleged debt."  [*Id.* ¶ 74].

### 2.  *Plaintiff's Causes of Action and the Putative Classes*

In Count One of the Amended Complaint, Plaintiff brings class claims against Shellpoint for violations of RESPA for failing to remove the interest and fees in response to consumers' QWRs.  [Am. Compl. ¶¶ 1, 3–20, 24–26, 34–42, 57–74, 75–80, 83–93].  In Count Two, Plaintiff brings class claims for violations of TILA for failing to send monthly statements.  [*Id.* ¶¶ 1, 3–20, 24–26, 34–56, 75–80, 95–100]. In Count Three, Plaintiff seeks a declaratory judgment on behalf of the class that SLS and Shellpoint are not entitled to collect the alleged illegal interest and fees.

[*Id.* ¶¶ 1, 3–20, 24–26, 34–56, 75–81, 102–106]. In Count Four, Plaintiff brings an individual claim against Shellpoint for RESPA violations. [*Id.* ¶¶ 1, 3–19, 21, 24–26, 34–42, 57–74, 108–20]. In Count Five, Plaintiff brings an individual claim under Georgia law against Shellpoint for the allegedly improper attempt to foreclose on her home. [*Id.* ¶¶ 1, 3–10, 21, 24–26, 34–42, 43–56, 122–27].

The Amended Complaint sets forth the following classes, of which Plaintiff alleges she is a member:

### QWR Class

All consumers: (1) with a federally-related closed-end mortgage serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (2) with a discharged mortgage loan; (3) who did not otherwise qualify as exempt from receiving statements under 12 C.F.R. § 1026.41(e)(5)(i); for whom SLS's records reflect were not receiving monthly mortgage statements after April 19, 2018; (4) and who, from November 22, 2021 to the present, sent SLS a Qualified Written Request that disputed SLS's assessment of interest or other fees on their mortgage; (4) in response to which, SLS refused to remove the interest or fees from the consumer's account[.]

### TILA Class

All consumers: (1) with a closed-end mortgage serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (2) who retained an interest in the property against which the loan was secured following a discharge of the debt during bankruptcy and who did not otherwise qualify as exempt from receiving statements under 12 C.F.R. § 1026.41(e)(5)(i); (3) and for whom Shellpoint's records show they did not send a written request to cease providing statements; (4) to whom Shellpoint's records show the consumer was not sent a periodic statement until within the past year.

**Declaratory Judgment Class**

All consumers: (1) with a closed-end mortgage serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (2) who retained an interest in the property against which the loan was secured following a discharge of the debt during bankruptcy and who did not otherwise qualify as exempt from receiving statements under 12 C.F.R. § 1026.41(e)(5)(i); (3) and for whom Shellpoint's records show they did not send a written request to cease providing statements; (4) to whom SLS did not send monthly mortgage statements starting after April 19, 2018; and (5) against whom SLS, Shellpoint, or its agents have collected or attempted to collect late fees, default-related fees or interest assessed for time periods when the consumer did not receive monthly statements.

[Am. Compl. ¶ 75].

Plaintiff alleges that the class members are so numerous that joinder of all is impractical. [Am. Compl. ¶ 76]. Upon information and belief, Plaintiff alleges that SLS serviced thousands of non-performing loans, subjecting all of them to the same procedures for SLS's response to their QWRs. [*Id.*]. According to Plaintiff's allegations, SLS also subjected all of them to the same procedures for the retroactive assessment of interest, and this was a practice Shellpoint allegedly continued after acquiring servicing rights to the loans. [*Id.*]. Plaintiff alleges that the names and addresses of the class members can be identified using Shellpoint's internal business records, and the class members may be notified of this litigation by published or mailed notice. [*Id.*].

Plaintiff next alleges that common questions of law and fact exist as to all putative class members, that there are no factual or legal issues that differ between the putative class members, and that the common questions of law and fact predominate over the questions affecting only individual class members. [Am. Compl. ¶ 77]. According to Plaintiff, the principal issues for the QWR Class include: (1) whether RESPA applies to the Plaintiff's and putative class members' loans; (2) whether Shellpoint violated § 2605(e)(2) of RESPA by failing to make the appropriate corrections in response to the Plaintiff's and putative class members' QWR; and (3) the appropriate amount of statutory damages. [*Id.*]. The principal issues for the TILA Class include: (1) whether Shellpoint is a "servicer" under TILA and Regulation Z; (2) whether Shellpoint and its predecessor, SLS, violated 15 U.S.C. § 1638 and 12 C.F.R. § 1026.41 by failing to send periodic statements to Plaintiff and the putative class members; and (3) the appropriate amount of statutory damages. [*Id.*]. Lastly, the principal issues for the Declaratory Judgment Class include: (1) whether Plaintiff and the putative class members are subject to ongoing harm absent a declaratory judgment; (2) whether Plaintiff and the putative class members are entitled to a declaratory judgment that they do not owe interest and fees for the months that they were not sent monthly statements after April 19, 2018; and (3) the appropriate scope of the declaratory judgment. [*Id.*].

Plaintiff alleges that her claims are typical of the claims of each putative class member.  [Am. Compl. ¶ 78].  She alleges that she also is entitled to relief under the same causes of action as the other putative class members and that all claims are based on the same facts and legal theories.  [*Id.*].

Regarding adequacy of representation, Plaintiff alleges that she is an adequate representative because her interests coincide with, and are not antagonistic to, the interests of the class members that she seeks to represent.  [Am. Compl. ¶ 79].  Plaintiff states that she has retained counsel who are competent and experienced in class-action litigation, including against SLS, and that she intends to continue to prosecute this action vigorously.  [*Id.*].  Plaintiff represents that she and her counsel will fairly and adequately protect the putative class members' interests.  [*Id.*].

Plaintiff alleges that questions of law and fact common to the class members predominate over questions affecting only individual members, and that a class action is superior to other available methods for fair and efficient adjudication of the controversy.  [Am. Compl. ¶ 80].  In support of these allegations, Plaintiff further alleges the following:

- The damages sought by each member are such that individual prosecution would prove burdensome and expensive.
- It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation.

14

- Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts.

- Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the conduct of SLS and Shellpoint.

- The class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

[*Id.*].

With respect to the class claim for a declaratory judgment, Plaintiff alleges that declaratory relief is appropriate because SLS and Shellpoint have acted or refused to act on grounds that apply generally to the class. [Am. Compl. ¶ 81]. Plaintiff alleges, for example, that SLS subjected thousands of loans to the same policies and procedures with respect to the mailing of monthly billing statements, which caused the putative class members not to receive the statements to which they were entitled, while also subjecting them to the same general policies and procedures for the assessment of retroactive interest and fees for the period in which SLS had not sent the putative class members statements. [*Id.*]. Shellpoint allegedly continued to apply these same policies and procedures to the Declaratory Judgment Class after it acquired and merged with SLS, causing the same ongoing harm to the putative class members that declaratory relief will address. [*Id.*].

## II.   <u>MOTION TO STRIKE CLASS ALLEGATIONS</u>

Shellpoint moves the Court to strike Plaintiff's class allegations.  [Doc. 25].

Shellpoint contends that the QWR Class claims should be stricken because the

proposed class cannot meet the criteria for class certification, and the underlying

RESPA claim requires an intense individualized review of each class member's

account and thus cannot be adjudicated on a class wide basis.  [Doc. 25-1 at 12–16].[1]

Shellpoint argues that the TILA and Declaratory Judgment Classes should be

stricken because the class claims brought under TILA and the Declaratory Judgment

Act are not viable as a matter of law.  [*Id.* at 16].

Because I conclude that Shellpoint is entitled to judgment as a matter of law

on the class claims brought under RESPA (Count One), TILA (Count Two), and the

Declaratory Judgment Act (Count Three), I need not address whether Plaintiff's

class allegations should be stricken due to any issues with the class certification

criteria or otherwise.  I will recommend that the motion to strike class allegations be

denied as moot, and I immediately will proceed to address the motion for judgment

on the pleadings.

---

[1] Because Shellpoint's brief includes a cover page, a table of contents, and a table of authorities, the page numbers of the brief differ from the pagination of the CM/ECF system.  For ease of reference, when citing Shellpoint's brief, I use the CM/ECF page numbers.

### III.    **MOTION FOR JUDGMENT ON THE PLEADINGS**

Shellpoint moves for judgment on the pleadings, asserting that all five causes of action in the Amended Complaint fail as a matter of law.  Shellpoint first argues that the QWR Class RESPA claim in Count One fails because it is based on a nonexistent TILA violation.  [Doc. 25-1 at 17–18].  Shellpoint next argues that Plaintiff's TILA class claim set forth in Count Two fails as a matter of law because loan servicers, like Shellpoint, cannot be liable under TILA.  [*Id.* at 8, 18–20].  Shellpoint contends that it is entitled to judgment on Plaintiff's class claim under the Declaratory Judgment Act, which is set forth in Count Three, because there is no actual controversy.  [*Id.* at 20–22].  With respect to Plaintiff's individual RESPA claim set forth in Count Four, Shellpoint argues that the claim fails because Plaintiff has no actual damages as a result of the purported RESPA violation.  [*Id.* at 22–25].  Finally, Shellpoint argues that Plaintiff's wrongful attempted foreclosure claim in Count Four fails as a matter of law because it is premised on a nonexistent TILA violation and because Plaintiff lacks damages.  [*Id.* at 25–26].

### A. **Standard of Review**

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  FED. R. CIV. P. 12(c).  Courts in the Eleventh Circuit

apply the same pleading standard for motions filed pursuant to Federal Rule of Civil Procedure 12(c) as they do for motions filed under Rule 12(b)(6); Rule 12(b)(6) allows the court to dismiss a complaint, or portions thereof, for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6); *see Losey v. Warden*, 521 F. App'x 717, 719 (11th Cir. 2013) (per curiam) (reviewing the grant of a motion for judgment on the pleadings and applying the motion to dismiss standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*")); *Griffin v. SunTrust Bank, Inc.*, 157 F. Supp. 3d 1294, 1295 (N.D. Ga. 2015) ("The legal standard for assessing a motion for judgment on the pleadings under Rule 12(c) is the same as the standard for a motion to dismiss under Rule 12(b)(6)."), *aff'd*, 648 F. App'x 962 (11th Cir. 2016) (per curiam).

Thus, a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure can be granted only if the complaint, with all factual allegations accepted as true, fails to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("*Twombly*"). A plaintiff's pleading obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* To survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*,

18

556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).   In considering a motion for judgment on the pleadings, the court must eliminate any allegations that are merely legal conclusions, and then, where there are well-pleaded factual allegations, assume their veracity and determine whether they plausibly give rise to an entitlement to relief. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). Although reasonable inferences are made in a plaintiff's favor in considering a motion for judgment on the pleadings, "unwarranted deductions of fact are not admitted as true." *Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (per curiam) (citation and quotation marks omitted).   As with a motion to dismiss, in deciding whether to grant a Rule 12(c) motion, courts "must accept all facts in the complaint as true and view them in the light most favorable to the plaintiff[ ]." *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006); *see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("The plaintiff's factual allegations are accepted as true.").

**B. <u>Analysis</u>**

Shellpoint moves the Court to enter judgment in its favor on all five claims in the Amended Complaint.   [Doc. 25-1 at 17].   Because Shellpoint's request for judgment on some of the claims is premised, either in whole or in part, on Shellpoint's argument that the TILA claim is not viable, I first will address the class

19

claim under TILA (Count Two).  I then will address the class claim under RESPA (Count One), the class claim under the Declaratory Judgment Act (Count Three), Plaintiff's individual RESPA claim (Count Four), and Plaintiff's individual attempted wrongful foreclosure claim (Count Five).

### 1. *Shellpoint is not subject to liability under TILA.*

TILA is a federal consumer protection statute intended to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare . . . the various credit terms available to him [or her] . . . avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."  15 U.S.C. § 1601(a).  Under TILA, a consumer has a private right of action against "any creditor who fails to comply with any requirement imposed under this part[.]"  15 U.S.C. § 1640(a).  Because Shellpoint is a mortgage servicer, not a creditor, Shellpoint argues that it cannot be held liable under TILA.  [Doc. 25-1 at 8, 18–20].  Plaintiff responds that Shellpoint's argument ignores the plain language of the statute and the regulations on which Plaintiff's claim under TILA is based.  [Doc. 42 at 15–20].

In Count Two of the Amended Complaint, Plaintiff seeks relief under 15 U.S.C. § 1638(f) and 12 C.F.R. § 1026.41.  Section 1638(f) requires creditors, assignees, and mortgage loan servicers to provide borrowers periodic statements that

contain certain information about the borrowers' loans.  15 U.S.C. § 1638(f).  This

information includes:

> the amount of the principal obligation under the mortgage; the current
> interest rate in effect; the date on which the interest rate may reset or
> adjust; the amount of any prepayment penalty that may be charged; late
> payment fees; a telephone number and electronic mail address that can
> be used to obtain information regarding the mortgage; the names and
> contact information of credit counseling agencies or programs
> reasonably available; and such other information as may be required by
> regulation

*Daniels v. Select Portfolio Servicing, Inc.*, 34 F.4th 1260, 1269 (11th Cir. 2022)

(citing 15 U.S.C. § 1638(f)(1)).  This provision of TILA is specifically implemented

by 12 C.F.R. § 1026.41, which requires these periodic disclosures to include

information regarding:

> the amount due; the payment due date; the amount of any late payment
> fee and the date on which it will be imposed; the monthly payment
> amount (including a breakdown of how the payment will be applied to
> principal, interest, and escrow); the total sum of any fees charged since
> the last statement; any payment amount past due; the total of all
> payments received since the last statement (including a breakdown of
> how the payments were applied); the total of all payments received
> since the beginning of the current calendar year (including a breakdown
> of how the payments were applied); a list of transaction activity since
> the last statement; partial payment information; a toll-free telephone
> number and electronic mail address to obtain information about the
> account; the amount of the outstanding principal balance; the current
> interest rate in effect; the existence of any prepayment penalty; and
> delinquency information (including the length of the delinquency, the

> risk of consequences like foreclosure, and notice as to whether the service has made the first notice required for foreclosure)

*Daniels*, 34 F.4th at 1269 (citing 12 C.F.R. § 1026.41(d)(1)–(8)).  Thus, the plain language of both Section 1638(f) and the implementing regulation obligates loan servicers to send periodic statements to borrowers.

However, "[a]lthough the requirements of Section 1638(f) and its implementing regulations apply to a mortgage servicer, a servicer cannot be held liable under TILA unless the servicer also owns the subject loan." *Naranjo v. Bank of Am.*, No. EDCV 23-546-KK-ASx, 2024 WL 1651914, at *4 (C.D. Cal. Feb. 23, 2024) (collecting cases); *see also Gonzalez v. Specialized Loan Servicing, LLC*, No. 2:23-cv-4119-MCS-RAO, 2024 WL 4867230, at *3 (C.D. Cal. Aug. 20, 2024) (granting judgment as a matter of law in favor of loan servicer on purported violations of 15 U.S.C. § 1638(f) and 12 C.F.R. § 1026.41 because a loan servicer cannot be liable under TILA unless it is also the owner of the loan); *Gillaspy v. Wells Fargo Bank, N.A.*, No. 2:22cv193-RAH, 2024 WL 898887, at *6 (M.D. Ala. Mar. 1, 2024) (ruling that plaintiff could not maintain a cause of action directly against loan servicer under TILA for failing to send monthly billing statements because the private right of action under TILA applies only to actions against creditors); *Chandler v. Greenlight Fin. Servs.*, No. 2:20-cv-217, 2021 WL 1202078, at *17 (S.D. W. Va. Mar. 30, 2021) (dismissing claim that loan servicer violated 12

C.F.R. § 1026.41 by not sending periodic statements because TILA does not impose civil liability on loan servicers); *Oh v. Ocwen Loan Servicing, LLC*, No. 18-cv-7214, 2021 WL 131432, at *4–5 (N.D. Ill. Jan. 14, 2021) (dismissing plaintiff's claim for TILA violation based on failure to provide periodic statements because defendant was not a creditor under TILA); *Shilo v. Ditech Fin. LLC*, No. 16-11564, 2017 WL 3202725, at *6 (D. Mass. July 26, 2017) (granting motion for judgment on the pleadings because a mere servicer cannot be held liable under Section 1638(f) and its implementing regulations), *aff'd*, No. 17-1884, 2018 WL 11442317 (1st Cir. May 22, 2018). *But see Novobilski v. Specialized Loan Servicing*, No. 2:22-cv-147-MEMF-MAR, 2022 WL 3566812, at *10 (C.D. Cal. Aug. 16, 2022) (finding that the plaintiff sufficiently plead that loan servicer violated TILA by failing to provide copies of their monthly mortgage statements); *Pierson v. Ocwen Loan Servicing, LLC*, No. 3:15-cv-2314-N, 2017 WL 10110296, at *3 (N.D. Tex. June 22, 2017) (allowing TILA claim against loan servicer to survive a motion to dismiss where plaintiff alleged he did not receive a monthly statement for at least two periodic billing cycles).

As set forth above, most courts that have considered the issue agree that TILA's private right of action does not apply to actions against mortgage loan servicers that are not also creditors, even when a plaintiff alleges violations of 15

U.S.C. § 1638(f) and 12 C.F.R. § 1026.41.  I find the reasoning of those courts'

decisions persuasive.    Because "[t]he text of TILA's civil damages

provision . . . provides only for creditor liability–not servicer liability . . . servicers

cannot be held liable under TILA and, by extension, the regulations promulgated

thereunder. . . ."  *Bernstein v. Wells Fargo & Co.*, No. 1:18-cv-2887-RWS-CMS,

2018 WL 7018007, at *9 (N.D. Ga. Nov. 28, 2018), *adopted by* 2019 WL 177206

(N.D. Ga. Jan. 3, 2019).  Therefore, I will recommend that the motion for judgment

on the pleadings be granted as to Plaintiff's class claim under TILA in Count Two.[2]

### 2.  *Shellpoint is entitled to judgment on the RESPA class claim.*

With respect to Count One of the Amended Complaint, Shellpoint argues that

the RESPA class claim fails because it is predicated on a nonexistent TILA violation.

[Doc. 25-1 at 17].  Plaintiff maintains that she has plead a plausible RESPA claim

in Count One.  [Doc. 42 at 20].  Plaintiff emphasizes that RESPA is a separate statute

---

[2] Plaintiff states in her opposition brief that "should the Court agree with Shellpoint and find that servicers may not be held liable under any provision of TILA, even those that expressly include them, Plaintiff respectfully requests leave to amend her complaint to state a TILA claim against the creditor of her loan." [Doc. 42 at 20].  However, making this request in her brief is not the proper way to request leave to amend.  "To properly request leave to amend, a plaintiff must satisfy two requirements: (1) file a motion for leave to amend and (2) either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Advance Tr. & Life Escrow Servs., LTA v. Protective Life Ins. Co.*, 93 F.4th 1315, 1336 (11th Cir. 2024) (citation modified).

that imposes separate obligations, and Plaintiff argues that violations of those obligations are independently actionable. [*Id.* at 21].

RESPA imposes a duty on mortgage loan servicers to respond to borrower inquiries. 12 U.S.C. § 2605(e); *see* 12 C.F.R. § 1024.36(a). When a "servicer of a federally related mortgage loan receives a [QWR] from the borrower . . . for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A). A QWR is "a written correspondence" that "includes, or otherwise enables the servicer to identify" the borrower's name and account. *Id.* § 2605(e)(1)(B)(i). Moreover, a QWR must include "a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." *Id.* § 2605(e)(1)(B)(ii).

After receiving a QWR, a loan servicer has thirty business days to "make appropriate corrections in the account of the borrower" and notify the borrower of any such corrections in writing. 12 U.S.C. § 2605(e)(2). Alternatively, the servicer has thirty business days to investigate and provide the borrower with a written explanation of why the servicer believes the borrower's account is correct or provide

the borrower with the information sought or explain why the information is unavailable. *Id.* § 2605(e)(2)(B)(i)–(C)(i).

In Count One of the Amended Complaint, Plaintiff alleges that "Shellpoint violated 12 U.S.C. § 2605(e)(2) by failing to make appropriate corrections to Plaintiff's and the putative class members' account in response to their [QWRs], including removal of the improper interest and fees from their account assessed during the time that they were not receiving monthly statements." [Am. Compl. ¶ 83]. Plaintiff further alleges that "[t]hese charges were not permissible because the consumers were not receiving monthly mortgage statements, even though SLS was required to send them after the April 2018 amendments to Regulation Z," [*Id.* ¶ 84]. According to Plaintiff's allegations, SLS therefore "should have removed the charges in response to the Plaintiff's and putative class members' QWRs." [*Id.*]. Plaintiff also alleges that Shellpoint/SLS failed to conduct a reasonable investigation in response to Plaintiff's and putative class members' QWRs, and Plaintiff claims that "[h]ad a reasonable investigation occurred, Shellpoint/SLS would have discovered that no interest could lawfully accrue on the loan because SLS and

Shellpoint had not sent periodic statements to Plaintiff and putative class members since the April 2018 Regulation Z updates." [*Id.* ¶¶ 85, 86].

According to Shellpoint, because the obligation to provide monthly statements comes from TILA and TILA only, Plaintiff essentially is alleging that Shellpoint violated RESPA because it violated TILA. [Doc. 25-1 at 17–18]. Shellpoint maintains that Plaintiff cannot do this by law, entitling Shellpoint to judgment on the RESPA class claim. [*Id.* at 18].

In opposition to the motion for judgment on the pleadings, Plaintiff argues that Shellpoint's obligation to make appropriate corrections to her account and the accounts of the putative class members under RESPA is separate from any obligation under TILA. [Doc. 42 at 22]. She maintains that regardless of whether Shellpoint can be held liable under TILA for failing to send monthly statements to borrowers, its failure to send any such statements precluded it from charging interest and fees for those periods in which it did not send statements, as TILA requires.

There is no dispute that TILA and its implementing regulation requires loan servicers to send borrowers periodic statements. 15 U.S.C. § 1638(f); 12 C.F.R. § 1026.41. Further, as stated above, RESPA obligates loan servicers, in response to a QWR, to "make appropriate corrections in the account of the borrower" or provide the borrower with a written explanation of why the servicer believes the borrower's

27

account is correct or provide the borrower with the information sought or explain why the information is unavailable.  12 U.S.C. § 2605(e)(2).  But Plaintiff cites no legal authority to support the propositions that Shellpoint's failure to send periodic statements precluded it from charging interest and fees for those periods in which it did not send statements and that Shellpoint was thus required to make corrections to Plaintiff's and other putative class members' accounts.  *See generally* [Doc. 42]. Notably, while analyzing a claim brought under the Fair Debt Collection Practices Act ("FDCPA") that involved a similar issue, at least one court has endorsed the argument that the "breach of an obligation to provide monthly statements does not somehow make the interest disallowed or unlawful."  *Gonzalez v. Specialized Loan Servicing, LLC*, 691 F. Supp. 3d 1162, 1176 (C.D. Cal. 2023); *see also Naranjo v. Bank of Am.*, No. EDCV 23-546-KK-ASx, 2024 WL 3915080, at *7 (C.D. Cal. Apr. 25, 2024) ("Plaintiffs fail to identify any other basis for concluding Defendants were prohibited from charging interest and fees based upon their failure to transmit periodic statements.").

Moreover, as Shellpoint argues, Plaintiff's claim that Shellpoint should have corrected the accounts by removing the charges is plainly predicated on Shellpoint's alleged violations of its obligations under TILA.  Because I have concluded that the alleged TILA violations are not actionable against Shellpoint, I do not believe that

28

those alleged violations can form the basis of the class claim under RESPA against Shellpoint. *Cf. Richards v. NewRez LLC*, No. ELH-20-1282, 2021 WL 1060286, at *28 (D. Md. Mar. 18, 2021) (stating in FDCPA context that "courts have consistently ruled that the FDCPA 'is not properly used as an enforcement mechanism for the TILA,' especially where the plaintiffs could not succeed on a TILA claim, independently." (collecting cases)); *Lee v. Northland Grp.*, No. 02 C 6083, 2003 WL 25765398, at *1 (N.D. Ill. Apr. 24, 2003) (dismissing plaintiff's FDCPA and Illinois Consumer Finance Act claims that were "entirely predicated on her nonexistent TILA violation"). Based on the parties' briefs and my research, this appears to be an issue of first impression in the context of a plaintiff seeking to use RESPA to enforce TILA obligations, but Plaintiff has not presented any arguments or cited any legal authority that persuades me to resolve this issue in her favor. Accordingly, I will recommend that the motion for judgment on the pleadings be granted with respect to the RESPA class claim in Count One of the Amended Complaint.

### 3. Plaintiff's Declaratory Judgment class claim also cannot survive without a viable TILA claim.

Shellpoint next moves for judgment on the pleadings as to Plaintiff's class claim seeking a declaratory judgment in Count Three of the Amended Complaint. Shellpoint argues that because there is no cognizable claim for a TILA violation, there is no "actual controversy" between the parties. [Doc. 25-1 at 20]. Shellpoint

states: "Granting the requested declaration based on Shellpoint's non-violation of TILA would amount to an impermissible advisory opinion and potentially provide Plaintiff relief on a claim for which Congress intentionally has not created a private right of action." [*Id.* at 22]. Consequently, Shellpoint maintains that it is entitled to judgment as a matter of law on the declaratory judgment claim.

Plaintiff responds that she need not plead an actionable TILA claim to seek a declaration of her and the Declaratory Judgment Class members' rights in relation to Shellpoint. [Doc. 42 at 22–23]. Plaintiff acknowledges that "TILA may be the source of law requiring the sending of statements," but she maintains that it is not necessary for her to have a viable TILA claim against Shellpoint to obtain a declaration that Shellpoint cannot charge interest against her or putative class members for periods when Shellpoint did not send them statements. [*Id.* at 23]. Plaintiff claims this is so because there remains an active controversy as to the rights of the parties under their loan contracts, and Shellpoint, as the loan servicer, is the party responsible for collecting those amounts. [*Id.*].

 "Consistent with the 'cases' and 'controversies' requirement of Article III, the Declaratory Judgment Act, 28 U.S.C. § 2201, specifically provides that a declaratory judgment may be issued only in the case of an 'actual controversy.'" *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999)

(citations omitted).   The Declaratory Judgment Act is procedural and does not impact a party's substantive rights.  *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) (citation omitted); *see also Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) ("The operation of the Declaratory Judgment Act is procedural only.").  A declaratory judgment is a potential remedy that must be supported by an actionable, underlying cause of action.  *See Newton v. Brighthouse Life Ins. Co.*, No. 1:20-cv-2001-AT, 2021 WL 2604654, at *7 (N.D. Ga. Mar. 11, 2021) (dismissing claims for declaratory and injunctive relief because they are remedies, rather than freestanding causes of action, and the plaintiff failed to state a claim for a cause of action supporting those requested remedies).

There can be no claim seeking a declaration as to whether a federal statute has been violated where there is no private right of action available for the alleged statutory violation.  *See Schilling v. Roger*, 363 U.S. 666, 677 (1960) (holding that declaratory judgment action failed because there was no private right of action under Trading with the Enemy Act); *Florida v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1250 (11th Cir. 1999) (dismissing claim where plaintiff sought judgment declaring tribal gaming was being unlawfully conducted because the Indian Gaming Regulatory Act did not create private right of action).  "To entertain, under the auspices of the Declaratory Judgment Act, a cause of action brought by private

parties seeking a declaration that [a statute] has been violated would, in effect, evade the intent of Congress not to create [a] private right[] of action under th[at] statute[] and would circumvent the discretion entrusted to the executive branch in deciding how and when to enforce th[at] statute[]." *Jones v. Hobbs*, 745 F. Supp. 2d 886, 893 (E.D. Ark. 2010), *aff'd sub nom. Williams v. Hobbs*, 658 F.3d 842 (8th Cir. 2011).

In Count Three of the Amended Complaint, Plaintiff alleges that "[b]ecause the Plaintiff and putative class members were the subject of collection effort [sic] that included interest and fees that the Plaintiff and putative class members did not owe, SLS/Shellpoint is attempting to collect more money than is due under the Plaintiff's and putative class members' loans." [Am. Compl. ¶ 102.]. Plaintiff further alleges that she and the members of the putative class are "subject to ongoing harm absent a declaration that interest and fees are waived and/or unenforceable, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices." [*Id.* ¶ 103]. Plaintiff alleges that there is an actual, justiciable controversy that is not speculative, and Plaintiff claims that "a declaratory judgment is the appropriate mechanism for resolving the ongoing attempted imposition of the interest and fees." [*Id.* ¶¶ 104, 105]. Plaintiff identifies Shellpoint's alleged failure to provide periodic statements as the substantive basis for this requested declaratory judgment remedy, stating that she "seeks a declaratory

judgment that all interest and fees assessed for periods from April 19, 2018 to the present in which SLS/Shellpoint or its predecessors-in-interest failed to provide periodic statements are waived and/or unenforceable." [*Id.* ¶ 106]. Thus, it is the alleged TILA violation that underlies Plaintiff's request for declaratory relief.

As I concluded above, mere loan servicers, like Shellpoint, are not subject to liability under TILA. As such, allowing Plaintiff to proceed with a declaratory judgment claim against Shellpoint, with TILA as the source of the underlying substantive law, would be tantamount to allowing a private cause of action against loan servicers that does not exist. Despite Plaintiff's urging, the Court will not permit Plaintiff to use the Declaratory Judgment Act to circumvent Congress's intent not to provide a private cause of action against mere loan servicers under TILA.

Based on the foregoing, I will recommend that the motion for judgment on the pleadings be granted as to Plaintiff's declaratory judgment class claim set forth in Count Three of the Amended Complaint.[3]

### 4. *Plaintiff's individual claim under RESPA remains viable.*

Count Four of the Amended Complaint is Plaintiff's individual RESPA claim. Shellpoint argues that this claim fails as a matter of law because Plaintiff has no

---

[3] Plaintiff again imbeds in her opposition brief a request that the Court permit her leave to amend to seek a declaratory judgment against the owner of her loan if

actual damages proximately caused by Shellpoint's purported RESPA violation. [Doc. 25-1 at 22]. Plaintiff argues in response that she has alleged several types of actual damages that resulted from Shellpoint's allegedly deficient QWR response, including continuing lost equity in her property, informational injury that prevented her from obtaining information that would have supported her disputes, and emotional distress. [Doc. 42 at 23–24]. According to Plaintiff, her allegations of emotional distress are alone sufficient to support the damages element of her RESPA claim. [*Id.* at 25]. I agree.

To prevail on a RESPA claim, a plaintiff must show (1) defendant's failure to comply with a RESPA obligation and (2) that plaintiff sustained actual damages as a result of the failure to comply. *Baez v. Specialized Loan Servicing, LLC*, 709 F. App'x 979, 982 (11th Cir. 2017) (citing *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016)). "[D]amages are an essential element in pleading a RESPA claim." *Renfroe*, 822 F.3d at 1246. Moreover, RESPA requires a causal link between the mortgage servicer's alleged noncompliance and the claimed damages. *Id.*

---

the Court disagrees with her position. [Doc. 42 at 23 n.5]. As I stated in connection with Plaintiff's request to amend the TILA claim, this is not the proper way to seek leave to amend. *See Advance Tr. & Life Escrow Servs., LTA*, 93 F.4th at 1336.

Non-economic damages, such as emotional distress, are recoverable under RESPA when tied to a statutory violation. *See Ranger v. Wells Fargo Bank N.A.*, 757 F. App'x 896, 902 (11th Cir. 2018) (per curiam) ("Construing RESPA's unqualified language of 'actual damages' broadly, and based on the interpretations of 'actual damages' in other consumer-protection statutes that are remedial in nature, we see no reason why a plaintiff cannot recover non-pecuniary damages, such as emotional distress, under RESPA."); *McLean v. GMAC Mortg. Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010) (interpreting the phrase "actual damages" to mean that all plaintiffs "arguably may recover for non-pecuniary damages, such as emotional distress and pain and suffering, under RESPA" (alteration added; citation omitted)).

Here, Plaintiff has sufficiently plead actual damages. Plaintiff alleges that she sent QWRs in July and September 2024, asking Shellpoint to provide her with information about the servicing of her loan. [Am. Compl. ¶ 111]. She alleges that Shellpoint violated RESPA by failing to provide her with most of the information she requested or to explain why the requested information was not available. [*Id.* ¶ 113]. Examples of information Shellpoint allegedly did not provide include servicing notes, a full account history, and invoices for each of the charges that it had assessed to her loan. [*Id.* ¶ 114]. Plaintiff alleges that "[b]ecause of Shellpoint's conduct, Plaintiff suffered concrete and particularized harm, including:

informational injury and emotional distress, including aggravation and distress from the threatened loss of her family home to foreclosure and the lost equity in her home because Shellpoint refused to remove the inflated interest charges." [*Id.* ¶ 115].

Shellpoint argues that Plaintiff's receipt of the documents would not have erased the allegedly inflated interest charges from her account or prevented them from being imposed, as Plaintiff was already in default and they were already assessed by the time Plaintiff sent her correspondence to Shellpoint. [Doc. 25-1 at 24]. "However, the fact of a plaintiff's default does not foreclose the availability of emotional distress damages under RESPA." *Perdum v. Wells Fargo Home Mortg.*, No. 1:17-cv-972-SCJ-JCF, 2019 WL 4804108, at *5 (N.D. Ga. June 10, 2019), *adopted by* 2019 WL 4752302 (N.D. Ga. July 12, 2019) (citation omitted); *see also Delia v. Ditech Fin. LLC*, No: 6:16–cv–1901–Orl–31DCI, 2017 WL 2379819, at *8 (M.D. Fla. June 1, 2017) (denying motion to dismiss RESPA claim because "while much of the damage [the plaintiff] complains of may have existed before [the defendant] sent its RESPA response, the Court can reasonably infer that [the defendant]'s alleged failure to provide the information that [the plaintiff] requested

36

exacerbated the frustrations and difficulties that he may have already been suffering.").

Citing out-of-circuit cases, Shellpoint also argues that emotional distress damages cannot, on their own, establish actual damages. [Doc. 25-1 at 25]. But courts within the Eleventh Circuit, including this Court, have ruled otherwise. *See, e.g.*, *Jones v. Midland Mortg. Corp.*, No. 1:17-cv-246-MHC, 2018 WL 4850124, at *5 (N.D. Ga. Aug. 24, 2018) (ruling that allegations of emotional distress are sufficient to allege actual damages and to allow a RESPA claim to survive a motion to dismiss); *Nelson v. Nationstar Mortg., LLC*, 504 F. Supp. 3d 1307, 1317 (S.D. Ala. 2020) (allowing RESPA claim to survive summary judgment where evidence of actual damages was limited to plaintiff's emotional distress).

Of course, later at the summary judgment stage, Plaintiff will have the burden of presenting "'evidence to establish a causal link between the [servicer's] noncompliance and [her] damages.'" *Baez*, 709 F. App'x at 982 (citing *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1027–28 (11th Cir. 2001) (en banc)). "[N]either conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a . . . violation occurred" will suffice. *McLean*, 398 F. App'x at 471. Plaintiff ultimately may recover only emotional distress damages on her RESPA claim that were proximately caused by the alleged RESPA violation and not for emotional

distress that preceded or was unrelated to the RESPA violation. *Blackburn v. BAC Home Loans Servicing, LP*, 914 F. Supp. 2d 1316, 1324 n.6 (M.D. Ga. 2012). At this stage of the proceedings, however, I have construed Plaintiff's allegations in the light most favorable to her and afforded her all reasonable inferences, as is required. *See Ranger*, 757 F. App'x at 902. Having done so, I find that Plaintiff has alleged facts that could plausibly give rise to recoverable, actual damages, making judgment as a matter of law inappropriate. Accordingly, I will recommend that Shellpoint's motion for judgment on the pleadings be denied with respect to the individual RESPA claim in Count Four of the Amended Complaint.

### 5. *Plaintiff's wrongful attempted foreclosure fails as a matter of law.*

Shellpoint finally moves for judgment on the pleadings with respect to Plaintiff's wrongful attempted foreclosure claim in Count Five of the Amended Complaint. Shellpoint argues that this claim, too, is based on a nonexistent TILA violation and that Plaintiff lacks damages. [Doc. 25-1 at 25]. Plaintiff argues in response that she is seeking equitable relief, not damages. [Doc. 42 at 26]. Relying on *Morgan v. Ocwen Loan Servicing, LLC*, 795 F. Supp. 2d 1370, 1377 (N.D. Ga. 2011), Plaintiff maintains that courts have recognized as actionable wrongful

foreclosure claims seeking to prevent the bad faith exercise of the power of sale under Georgia law.  [Doc. 42 at 26].

Regardless of the relief that Plaintiff seeks, a plaintiff asserting a claim for attempted wrongful foreclosure must allege "'a knowing and intentional publication of untrue and derogatory information concerning the debtor's financial condition, and that damages were sustained as a direct result of this publication.'"  *Jenkins v. McCalla Raymer, LLC*, 492 F. App'x 968, 972 (11th Cir. 2012) (per curiam) (quoting *Aetna Fin. Co. v. Culpepper*, 320 S.E.2d 228, 232 (1984)).  Because Plaintiff has not alleged any damages that were sustained following a foreclosure publication, Shellpoint is entitled to judgment as a matter of law on the attempted wrongful foreclosure claim set forth in Count Five of the Amended Complaint.[4]  *See Sparra v. Deutsche Bank Nat'l Tr. Co.*, 785 S.E.2d 78, 83 (2016) ("Sparra also does

---

[4] A claim for wrongful foreclosure, which Plaintiff mentions in her opposition brief but which is not alleged in the Amended Complaint, is a distinct cause of action from an attempted wrongful foreclosure claim.  *See Humphrey v. JP Morgan Chase Bank, N.A.*, 787 S.E.2d 303, 306 (2016) ("Georgia law recognizes separate causes of action for wrongful foreclosure and wrongful attempted foreclosure.").  Because "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment[,]" *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004), I disregard Plaintiff's arguments concerning a wrongful foreclosure claim.

not allege any damages as a result of the foreclosure publication for which he could recover, rendering this claim without merit.").

## IV.    <u>CONCLUSION</u>

For the reasons stated, I **RECOMMEND** that the motion for judgment on the pleadings [Doc. 25] be **GRANTED in part** and **DENIED in part**.  The motion should be granted as to all claims in the Amended Complaint, except Plaintiff's individual claim under RESPA, which is set forth in Count Four of the Amended Complaint.  If this recommendation is adopted, no class claims will remain. Therefore, I **FURTHER RECOMMEND** that the motion to strike class allegations [Doc. 25] be **DENIED as moot**.

**IT IS SO RECOMMENDED AND ORDERED**, this 12th day of December, 2025.



Catherine M. Salinas
United States Magistrate Judge